AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Central District of California

FILED
CLERK, U.S. DISTRICT COURT

MAR 28 2019

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

| United States of America | |
|---|---|
| v. | Case No. |
| MOTTY MIZRAHI and SASSI MIZRAHI, | **19 MJ01289** |
| Defendants | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

From on or about the dates of November 19, 2012 through at least on or about February 21, 2019, in the county of Los Angeles in the Central District of California, the defendants violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 1343 | Wire Fraud |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*Complainant's signature*

CRAIG M. SCHNEIDER, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  3/28/2019

_____
*Judge's signature*

City and state:  Los Angeles, California

Hon. Alicia G. Rosenberg, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT

I, Craig M. Schneider, being duly sworn, declare and state as follows:

### I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of criminal complaints and arrest warrants for MOTTY MIZRAHI and SASSI MIZRAHI for violations of 18 U.S.C. § 1343 (Wire Fraud), among other offenses.

2. This affidavit is also made in support of an application for a warrant to search:

   a. A home office within a residence located at 17834 Burbank Boulevard, Suite 229, Encino, California 91316, which functions as the office of an investment company holding itself out as MBIG Company ("MBIG"), operated by MOTTY MIZRAHI and SASSI MIZRAHI, the sons of the owners of the residence (the "SUBJECT PREMISES"), as further described in Attachment A-1;

   b. The person of MOTTY MIZRAHI, as further described in Attachment A-2;

   c. The person of SASSI MIZRAHI, as further described in Attachment A-3.

3. The requested warrants seek authorization to search and seize evidence, fruits, and instrumentalities of violations of Sections 1341 (mail fraud); 1343 (wire fraud); 1349 (conspiracy to commit mail, wire, and bank fraud); and 1028A (aggravated identity theft) of Title 18 of the United States Code (the "SUBJECT OFFENSES"), as further described in Attachment B.

4. Attachments A-1 through A-3 and B are herein incorporated by reference.

5.  The facts set forth in this affidavit are based upon my personal observations, my training and experience, information obtained from various civil-regulatory and criminal law-enforcement personnel and witnesses, as well as from pleadings filed in various civil actions, including but not limited to SEC v. Motty Mizrahi and MBIG Co., (C.D. Cal.), as well as two other civil actions filed by victim-investors in California Superior Court.  This affidavit is intended to show merely that there is sufficient probable cause for the warrants requested, and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related only in substance and in part.

## II. BACKGROUND FOR SPECIAL AGENT CRAIG SCHNEIDER

6.  I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), and have been so employed since March 2018. I am currently assigned to a White Collar Criminal Squad within the Los Angeles Field Office, and I specialize in complex financial crimes. I have completed approximately 21 weeks of formal training in investigative techniques and white collar matters at the FBI Academy located in Quantico, Virginia.  Since joining the FBI, I have participated in numerous white collar crime investigations into corporate and securities fraud, as well as Ponzi and other pyramid schemes.  Prior to becoming an FBI SA, I received a Master of Business Administration degree with an emphasis in finance, and worked as a credit risk analyst and approval officer at a global financial institution.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

7. From at least or around fall 2012 through March 2019, MOTTY MIZRAHI has held himself out as a sophisticated investment advisor and money manager. Relying on his close family and personal connections to the Israeli and religious Jewish community of the San Fernando Valley within the Central District of California, MOTTY MIZRAHI has collected millions of dollars from members of those communities by promising to employ expertise in investment "insurance" contracts and other financial products to generate "guaranteed" monthly returns of approximately 2-3%. MOTTY MIZRAHI also recruited and assured investors by falsely representing that the majority of funds invested would remain in cash, and, therefore, that investment funds would be sufficiently liquid to permit on-demand withdrawal by investors at all times.

8. As part of his scheme to defraud investors, MOTTY MIZRAHI provided a prospectus containing and supporting these representations, which falsely and fraudulently represented high rates of prior returns.

9. In fact, MOTTY MIZRAHI's claims of "guaranteed" returns were false. But rather than inform investors of his millions in net losses, MOTTY MIZRAHI instead perpetuated his scheme to defraud by providing victim-investors with false and fraudulent account statements showing consistent monthly gains.

10. The gains represented in these emailed account statements did not exist. Instead, these falsified account statements were part of a scheme by MOTTY MIZRAHI and SASSI MIZRAHI to lull investors into foregoing notification of authorities.

11.     Although MOTTY MIZRAHI's personal E*Trade account was terminated by E*Trade effective November 1, 2018, MOTTY MIZRAHI and SASSI MIZRAHI showed, and discussed with investors as late as on or about February 21, 2019, purported statements and balances within that account, and also sent them additional MBIG monthly statements falsely and fraudulently showing consistent monthly gains.  MOTTY MIZRAHI and SASSI MIZRAHI further misrepresented the E*Trade account as a corporate account in the name of MBIG, when, in fact, no such corporate account ever existed at E*Trade.

12.     At least five victim-investors who invested funds with MOTTY MIZRAHI and MBIG have unsuccessfully attempted to withdraw their funds from MBIG notwithstanding MOTTY MIZRAHI's representations that their investments would be on an on-demand basis.

## IV. STATEMENT OF PROBABLE CAUSE

13.     As described more fully below, the FBI has been conducting an investigation of a scheme orchestrated by MOTTY MIZRAHI to obtain money from victim-investors through false representations, pretenses, promises and other fraudulent devices. Based on my review of financial records, sworn testimony, civil pleadings, communications to and from MOTTY MIZRAHI, my own observations and knowledge of the investigation, and my training and experience, I know the following:

### A.   OVERVIEW OF FRAUDULENT MISREPRESENTATIONS

a. Beginning as early as November 2012 and continuing through at least March 2019, MOTTY MIZRAHI persuaded victim-

investors to invest funds with MOTTY MIZRAHI and his purported investment firm, MBIG.

b. MOTTY MIZRAHI held himself out to victim-investors as a professional money manager, licensed broker, and certified public accountant ("CPA"); he claimed to employ sophisticated options trading strategies that generated "guaranteed" returns of between 2-3% per month.

c. MOTTY MIZRAHI further represented that victim-investors could not lose their money through his strategies; that his investment strategy is risk-free; that investor funds are secure and that the majority of those funds would remain in cash, with a high-yielding minority of those funds devoted to sophisticated option and insurance hedging strategies; and, therefore, that victim-investors could withdraw their money at any time.

d. MIZRAHI supported his oral misrepresentations with a written prospectus, titled, MBIG COMPANY PROSPECTUS ("prospectus") via email or in person.  This prospectus reported MBIG's rate of return, net of his purported 25% profit sharing, as the following: 2009 rate of return of 102.24%, 2010 rate of return of 64.37%, 2011 rate of return of 42.14%, 2012 rate of return of 30.91%, 2013 rate of return 36.06%, 2014 rate of return of 39.31%, 2015 rate of return of 37.33%, and 2016 rate of return 32.82%.  The prospectus also represented that "MBIG, most of time, only utilizes 20%-30% of the funds when it identifies good opportunities, and remaining funds are left in cash."

e.  Based on MOTTY MIZRAHI's representations, victim-investors entered into "Investor Agreements" with MBIG.  In at least some instances, that Investor Agreement guaranteed the investor's principal as long as the investment was held beyond a certain number of months.

f.  Victim-investors provided funds to MOTTY MIZRAHI through cash, checks, and interstate bank wires to MBIG's Bank of America account ending in #4115 (the "4115 account").  MOTTY MIZRAHI represented that those funds would then be transferred into a pooled MBIG E*Trade account, so that Mizrahi could invest funds an generate the promised monthly returns of 2-3%.

g.  MOTTY MIZRAHI then emailed victim-investors monthly statements purporting to show monthly profits typically between two and three percent.

h.  In fact, MBIG did not have a commercial brokerage account at E*Trade or anywhere else.  MOTTY MIZRAHI had two personal E*Trade accounts, #6270-9547 and 6178-2632, both of which were closed by E*Trade on November 1, 2018.  The falsified statements MOTTY MIZRAHI provided to investors listed 9547 as the last four digits of the account number, which matched the last four digit's of Mizrahi's personal E*Trade account number, yet listed the account under MBIG. Both personal accounts at E*Trade had less than $4,000 balance when E*Trade closed the accounts. The two personal accounts reported combined losses of approximately $2,077,943.59 from January 2015 to November 2018 from securities transactions.

B.   **FINANCIAL RECORDS CONTRADICT MOTTY MIZRAHI'S and SASSI MIZRAHI'S REPRESENTATIONS**

i.   E*Trade financial provided account information for MBIG and MOTTY MIZRAHI to the SEC. Based on my review of these financial records provided by the SEC, I am informed of the following:

i.   MBIG had no account with E*Trade.

ii.   MOTTY MIZRAHI had two personal accounts with E*Trade: accounts 6178-2632 and 6270-9547. E*Trade closed both accounts on or about November 1, 2018. Both MOTTY MIZRAHI accounts listed the SUBJECT PREMISES as their address.

j.   The November 2018 account statement for 6178-2632 showed a beginning account value (on 10/31/2018) of $497.81 and an ending account value (on 11/30/2018) of $0.00.

k.   Statements for prior time periods show losses as follows: $(155,740.83) for 2015; $(237,798.86) for 2016; $(173,719.93) for 2017; and $(87,961.28) for 2018.

l.   The November 2018 account statement for 6270-9547 showed a beginning account value (on 10/31/2018) of $3,654.99 and an ending account value (on 11/30/2018) of $0.00.

m.   Statements for prior periods show losses as follows: $(23,940.07) for 2015; $(953,945.03) for 2016; and $(489,009.60) for 2017. The 2018 ~~MBIG~~ statement showed a gain of $44,172.10.

n.   In total, these accounts show net losses of approximately $2,077,943.59 from 2015 through 2018.

**C.   LULLING ACTIVITY BY MOTTY MIZRAHI AND SASSI MIZRAHI; USE OF PHONES AND EMAIL**

o.   On dozens of occasions in 2018 and 2019, victim-investors exchanged text messages with MOTTY MIZRAHI via MOTTY MIZRAHI's iPhone, which is associated with the telephone number 818-645-6420, as demonstrated from his texts and calls with victim-investors as well as from phone subscriber information. In these exchanges, victim-investors demanded return of their investment principal.  MOTTY responded on dozens of occasions by texting victim-investors lulling reassurances and misrepresentations from the number associated with MOTTY's PHONE.

p.   MOTTY MIZRAHI and SASSI MIZRAHI held meetings with victim-investors demanding return of their principal at the SUBJECT PREMISES, which they held out as the MBIG offices.  No later than February 2019, MOTTY MIZRAHI and SASSI MIZRAHI have conducted meetings with victim-investors at the SUBJECT PREMISES, during which MOTTY MIZRAHI and SASSI MIZRAHI removed files from file cabinets therein and showed victim-investors falsified E*Trade statements purporting to show balances equally or exceeding between $6,000,000 and $9,000,000.

q.   When victim-investors asserted to MOTTY MIZRAHI that E*Trade had confirmed he had no active account, MOTTY MIZRAHI and SASSI MIZRAHI accessed at least one computer within the SUBJECT PREMISES, and showed victim-investors a link and document thereon purporting to establish that MBIG indeed had an active E*Trade account with an ample balance, but that E*Trade

provided a link that could be accessed no more often than once a month.  At least one victim-investor also testified in a sworn civil proceeding in or around February 2019 that the investor had seen multiple computer screens within the SUBJECT PREMISES appearing to show financial data, which MOTTY MIZRAHI represented were part of his sophisticated trading operations.

r.   From my analysis of the testimony and documents offered by victim-investors and financial institutions, MBIG and MOTTY MIZRAHI and SASSI MIZRAHI sent or received emails to and from victim-investors or financial institutions in connection with MBIG and their scheme to defraud from the following accounts:

        i.   mbigcorporation@yahoo.com

        ii.   mottym18@yahoo.com

        iii.   sassimizrahi@yahoo.com

**D.**  **TESTIMONY OF SPECIFIC VICTIM-INVESTORS**

s.   Victim-investor E.D. provided sworn testimony to the SEC on February 26, 2019.  Based on this testimony and E.D's declaration in a separate civil action, I am informed of the following:

        i.   In or around August 2014, E.D. met with MOTTY MIZRAHI to discuss investment opportunities.  MOTTY MIZRAHI represented that he would use E.D.'s funds to trade options, and that the funds would be secure from loss, while E.D. would enjoy between 35 to 40 percent returns over a six-month period.

ii.   In reliance upon these misrepresentations, E.D. tendered $100,000 to MOTTY MIZRAHI on or about August 26, 2014, and MOTTY MIZRAHI guaranteed that the principal investment would be returned as long as E.D. held the funds with MBIG through March 2015.  E.D. and MOTTY MIZRAHI further agreed that MBIG would retain 25% of the profits as its sole compensation.

iii. After MOTTY MIZRAHI represented to E.D. that the initial investment had generated a net profit to E.D. of $39,000, and provided E.D. a check to Dustar for the $39,000 of profit, E.D. and MOTTY MIZRAHI continued and expanded this course of dealing, and E.D. invested additional funds, equaling or exceeding $350,000 in total from 2015 to 2016, for which MOTTY MIZRAHI agreed to take only 15% of the profits as MBIG's sole compensation.

iv.   MOTTY MIZRAHI delivered account statements and summaries to E.D. in person, either by delivering them to E.D.'s residence, or arranging for E.D. to come to the SUBJECT PREMISES.

v.   On or about September 27, 2016, after E.D. requested return of his funds, MOTTY MIZRAHI showed E.D. two Investment Summary documents representing that E.D. was owed $283,505.30 for the $200,000 investment and $213,224.05 for the $150,000 investment.  MOTTY MIZRAHI then tendered two checks to E.D., both dated September 28, 2016.  Check number 1202, in the amount of $283,505.30, was purported to be for the contract ending in May of 2016; Check number 1203, in the amount of

10

$213,224.05, was purported to be for the contract ending in July 2016.

vi.   When E.D. attempted to negotiate these checks, they were returned for insufficient funds.   When E.D. advised MOTTY MIZRAHI that the checks were returned for insufficient funds, MOTTY MIZRAHI assured E.D. that he would make good on the checks.   On or about March 14, 2017, MOTTY MIZRAHI issued two new checks to E.D., with check number 1229 in the amount of $283,505.30 and check number 1230 in the amount of $213,224.05. These two checks were ultimately returned to E.D. with notification that MOTTY MIZRAHI had stopped payment on both.

vii. In or around August 2017, E.D. and MOTTY MIZRAHI met at the SUBJECT PREMISES, where E.D. photographed a July 2017 E*Trade account statement showing a final four account numbers of 9547, purporting to be in the name of MBIG Company, and showing a putative beginning balance of $6.521 million and an ending balance of $6.6 million.

viii.     On or about April 3, 2018, MOTTY MIZRAHI entered into a written agreement with E.D. in which he agreed to settle outstanding debts for $400,000, which amount was to be paid in full by June 2, 2018.   MOTTY MIZRAHI made only a single payment of $10,000; the balance remains due and outstanding.

**E.   Victim-Investor S.B.**

t.   Victim-investor S.B. provided sworn testimony to the SEC on February 19, 2019.  Based on this testimony, I believe the following:

i.   S.B. invested funds with MOTTY MIZRAHI and MBIG after MOTTY MIZRAHI represented that he was a broker, and that S.B.'s investment would be guaranteed with no risk of loss and available upon demand with a few weeks' notice.

ii.   MOTTY MIZRAHI also presented S.B. with a report containing graphs indicating MBIG had generated annual returns of 30% to 70% in recent years.  MOTTY MIZRAHI also showed S.B. a statement from E*Trade purporting to show an $8.6 million balance for the previous month, and an $8.8 million balance for the current month.

iii. On or about June 16, 2017, S.B. invested $60,000 with MBIG, and MOTTY MIZRAHI emailed a confirmatory welcome letter and receipt to S.B.  S.B. provided at least eight additional deposits into supposed MBIG account nos. 100-054, 100-056, and 100-057 between July 2017 and November 2017, totaling approximately $250,000.  MOTTY MIZRAHI provided email receipts for all of these deposits via email from mbigcorporation@yahoo.com ("MBIG EMAIL").

iv.   MOTTY MIZRAHI has continued to provide monthly statements of M.B.'s accounts, the latest of which was sent on or about February 8, 2019 from the MBIG EMAIL.  The statement for Account No. 100-057 indicated that the statement period was December 1–December 31, 2018, and reported a

beginning balance of $217,640.88, an ending balance of $221,821.76, and gains of $4,180.88, notwithstanding broader market losses of 8-9% in the same period. The statement for Account No. 100-054 was almost identical.

        v. MOTTY MIZRAHI has represented to S.B. multiple times, including as late as winter 2019, that all of the funds reported in the statements provided by MBIG are held in an E*Trade account, but that MOTTY MIZRAHI had become unable to withdraw these funds beginning in summer 2018 due to abnormal market activity.

        vi. MOTTY MIZRAHI had further represented that some $400,000 would free in or around November 2018 due to the expiration of an options contract, and sent an email from the MBIG EMAIL on or about November 2, 2018, which purported to show S.B.'s share of the expiring contract. Nevertheless, MOTTY MIZRAHI sent none of the promised funds to S.B.

        vii. Since in or around April 2018, MOTTY MIZRAHI has presented nine $10,000 checks to S.B., all but one of which contain the caveat, "Do not deposit without written consent" in the memo line. S.B. has been unable draw upon these checks due to MBIG's insufficient funds.

        viii. To date, S.B. has been able to withdraw only $20,000 of his investment with MBIG. He believes that MBIG has approximately 66 investors.

        ix. Until on or about December 2018, S.B. also exchanged numerous text messages with SASSI MIZRAHI through SASSI MIZRAHI's PHONE, which victim-investor and other

investigative records confirm is associated with telephone number 818-645-6460.  In these exchanges, SASSI MIZRAHI discussed S.B.'s investment.  In or around December 2018, SASSI MIZRAHI stopped responding to S.B.'s text-message questions and demands.

x.   On or about February 19, 2019, S.B., with other victim-investors, met with MOTTY MIZRAHI and SASSI MIZRAHI at the SUBJECT PREMISES.

xi.  As part of this meeting, portions of which S.B. recorded, MOTTY MIZRAHI assured the victim-investors that MBIG had adequate assets to repay principal, while warning that "nobody is going to get anything" if the government gets involved.  SASSI MIZRAHI then emphasized that government involvement might be behind the current inability to liquidate assets sufficient to repay the victim-investors, after previously assuring the victim-investors that their money was "safe."

**F.   Victim-Investor L.M.**

u.   Victim-investor L.M. provided sworn testimony to the SEC on February 13, 2019 and March 6, 2019.  Based on this testimony, I believe the following:

i.   L.M. met with MOTTY MIZRAHI to discuss investment opportunities in or around 2016.  MOTTY MIZRAHI represented that he was a broker as well as a CPA.  MOTTY MIZRAHI also presented L.M. with a document purporting to show MBIG performance of 2.5% monthly profits, and assured that MBIG

never lost money and that investor funds could be withdrawn on demand with two days' notice.

       ii.  In reliance upon these misrepresentations, L.M. tendered approximately $95,000 to MOTTY MIZRAHI, drawing on L.M.'s parents' assets, over which he had power of attorney.

       iii. In or around August 2017, MOTTY MIZRAHI gave L.M. the MBIG prospectus, and told L.M. that he should distribute the prospectus to potential investors, and that L.M. would be remunerated if those investors placed funds with MBIG.

       iv.  MOTTY MIZRAHI told L.M. that MBIG's funds were held in and invested through an E*Trade account.  After L.M. requested to see that E*Trade [account(s)] multiple times in late 2018 and early 2019, MOTTY MIZRAHI misrepresented that he could log in to the account no more than one time per month due to certain security restrictions.

       v.   MOTTY MIZRAHI also presented L.M. with a document purporting to show $400,000 in options contracts expiring in October 2018, from which L.M. was to receive $50,000.  After L.M. received no such funds, L.M. met MOTTY MIZRAHI and SASSI MIZRAHI for an in-person meeting at a Los Angeles Starbucks on or about December 10, 2018, during which MOTTY MIZRAHI assured L.M. that L.M. would receive $50,000 on or before December 27, 2018.  MOTTY MIZRAHI memorialized and confirmed this oral agreement by sending L.M. a confirmatory email from the MBIG EMAIL account.

       vi.  After the December 27, 2018 deadline passed without the transfer of any such funds, L.M. wrote an email to

MOTTY MIZRAHI, to which MOTTY MIZRAHI responded from the MBIG EMAIL to the effect that MOTTY MIZRAHI would check to see if the funds were available. MOTTY MIZRAHI and L.M. then exchanged numerous emails between December 26, 2018, and January 1, 2019, during which MOTTY MIZRAHI sent a number of lulling assurances from the MBIG EMAIL account.

vii. On or about February 21, 2019, L.M., S.B., and three other investors met MOTTY MIZRAHI and SASSI MIZRAHI at the SUBJECT PREMISES in order to question the two regarding their investments and their apparent inability to retrieve their principal as promised.

viii.    MOTTY MIZRAHI represented that it was possible to view the MBIG E*Trade account only by logging in via a computer at the SUBJECT PREMISES due to certain security restrictions upon the account. MOTTY MIZRAHI then clicked on a link from an email housed on a computer in the SUBJECT PREMISES, which appeared to call up an MBIG E*Trade account statement for showing funds exceeding $9,000,000.

**G.   Probable Cause to Believe Evidence of the Fraudulent Scheme will be Found at the SUBJECT PREMISES, Including on Computers and Other Digital Devices Found There, as well as on MOTTY'S PHONE and SASSI'S PHONE**

v.    The residence containing the SUBJECT PREMISES is listed as the mailing address for both of MOTTY MIZRAHI'S personal E*Trade accounts.

w.    The residence containing SUBJECT PREMISES is the mailing address on the Bank of America checks provided to victim-investor S.B. from MBIG's account ending in #4115.

x.   As noted, five victim-investors met with MOTTY MIZRAHI and SASSI MIZRAHI at the SUBJECT PREMISES on February 21, 2019, to discuss their investments and demands for return of funds.  On that date, at the SUBJECT PREMISES, MOTTY MIZRAHI presented L.M. and the other investors with E*Trade statements on the desktop computer located within the SUBJECT PREMISES. L.M. also described seeing a paper "worksheet list" relevant to MBIG in that office, and other victim-investors described file cabinets that MOTTY MIZRAHI had accessed in the course of the meeting.

y.   As noted, E.D. also testified that MOTTY MIZRAHI has met with him at the SUBJECT PREMISES to conduct MBIG business and withdraw MBIG files since 2015.

z.   Victim-investor B.A. provided sworn testimony to the SEC on February 6, 2019, which included the following:

i.   The SUBJECT PREMISES contain the MBIG office.

ii.   The SUBJECT PREMISES contain an L-shaped desk with multiple computers located on the desk, and a large four-drawer file cabinet.

aa.   Victim-investor T.O. provided sworn testimony to the SEC on February 7, 2019.  That testimony included the following:

i.   The SUBJECT PREMISES contain the MBIG office.

ii.   THE SUBJECT PREMISES contain a desktop computer, possibly two laptop computers, a file cabinet, and various papers.

## V.   TRAINING AND EXPERIENCE REGARDING SCHEMES TO DEFRAUD AND DIGITAL RECORDS AND DEVICES

14.   Based on my training and experience and information obtained from other civil and criminal law-enforcement personnel who investigate wire, mail, bank, and other similar schemes and conspiracies to defraud, I know the following:

a.   It is common for perpetrators of wire, mail, bank, and similar schemes to defraud or commit financial crimes to possess and use multiple digital devices at once.  Such digital devices are often used to facilitate, conduct, and track fraudulent transactions, as well as to communicate with co-schemers and co-conspirators regarding the scheme and the misrepresentations made to victim-investors.

b.   It is also common for individuals engaged in such crimes to preserve in electronic form their financial records, and to preserve such records across multiple digital devices, including smartphones, laptop computers, desktop computers, thumb and other external drives, and tablet devices.

c.   Persons soliciting, investing, and misappropriating and misrepresenting financial activities in connection with fraudulent schemes often create income tax and other tax and financial documents, copies of which documents are relevant to tracing the flow of funds through their fraudulent schemes and are often found on their digital devices.

## VI. TRAINING AND EXPERIENCE CONCERNING DIGITAL DEVICES[1]

15.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, among other forms of evidence, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents,

---

[1] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

16.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.    Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

17.    The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.    Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a

device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

18.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress MOTTY MIZRAHI's and/or SASSI MIZRAHI's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of their face(s) with their eyes open to activate the facial, iris, and/or retina-recognition feature.

19.   Other than what has been described herein, including in respect of existing investigations into and the gathering of financial documents concerning MBIG, to my knowledge, the United States has not attempted to obtain this data by other means.

### VII. **CONCLUSION**

20. Based on the foregoing, there is probable cause to believe that MOTTY MIZRAHI and SASSI MIZRAHI committed the SUBJECT OFFENSES, including but not limited to Wire Fraud.

21. I further submit there is probable cause to believe that evidence, fruits, and instrumentalities of the SUBJECT OFFENSES, as described above and in Attachment B to this affidavit, will be found at the SUBJECT PREMISES as well as on the persons of MOTTY and SASSI MIZRAHI, as further described above and in Attachments A-1 through A-3 of this affidavit.


_____
Craig M. Schneider, Special
Agent Federal Bureau of
Investigation


Subscribed to and sworn before me
this 28th day of March, 2019.

_____
HONORABLE ALICIA G. ROSENBERG
UNITED STATES MAGISTRATE JUDGE